[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 18-13926 & 19-13894

_____

D.C. Docket No. 3:16-cv-00212-MCR-EMT


QBE SPECIALTY INSURANCE CO.,

                              Plaintiff – Counter Defendant - Appellee,


versus


SCRAP INC.,

                              Defendant - Counter Claimant - Appellant.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

(March 13, 2020)

Before MARTIN, ROSENBAUM, and BOGGS,* Circuit Judges.

_____

* Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

PER CURIAM:

Scrap, Inc. ("Scrap") appeals the district court's grant of summary judgment in favor of QBE Specialty Insurance Co. ("QBE") regarding QBE's obligation to indemnify Scrap for a separate nuisance action against Scrap. Because the district court ruled correctly, we affirm.

## I.    FACTUAL BACKGROUND

Scrap is a Florida scrap-metal company. From approximately 2010 to 2012, Scrap was insured under general commercial-liability policies issued by QBE. Under the policies, QBE promised to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" where the "'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'" and "occurs during the policy period." "Bodily injury" was defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time," and "property damage" was defined as "'[p]hysical injury to tangible property, including all resulting loss of use of that property …,' or '[l]oss of use of tangible property that is not physically injured.'" The policy also contained an exclusion for "pollution," which was defined as "'bodily injury' or 'property damage' which would not have occurred in whole or part but for the

actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time."

The Mullinses and Rhodeses (the "families") are Florida residents who filed a state-court lawsuit against Scrap in March 2012 for nuisance stemming from its operation of a metal shredding facility. In the lawsuit, the families alleged that Scrap's shredding operation "create[d] loud noises, offensive odors, fumes, and other emissions of undisclosed content …, frequent vibrations to these homes, and periodic explosions." As a result, the families alleged that they "suffered annoyance, inconvenience, aggravation, discomfort, loss of use and enjoyment of property, mental anguish, pain and suffering, [and] actual physical damage to their properties." QBE was not a party to that lawsuit.

QBE agreed to defend Scrap in the underlying lawsuit and to provide counsel throughout the proceedings, but under a reservation of rights. Numerous times throughout the proceeding, QBE advised Scrap of the availability of and need for special jury instructions and special-interrogatory verdict forms. Additionally, QBE sought leave to intervene on two occasions for the limited purpose of requesting special jury instructions and special-interrogatory verdict forms. The court, however, denied QBE's motion, stating: "QBE has informed [Scrap's trial counsel] as well as the Defendants' private counsel that this case

3

requires a special interrogatory verdict form. There will be adequate lawyers at the table to make sure this Court provides a proper verdict form."

The jury instructions defined nuisance damages as "[a]ny annoyance, discomfort, inconvenience, or loss of ability to peacefully enjoy their property" and added that "[t]here is no exact standard for measuring such damage" but "[t]he amount should be fair and just in the light of the evidence."  On April 18, 2016, a jury found Scrap liable for nuisance damages and awarded $750,000 to the families.

On May 17, 2016, QBE initiated this action seeking a declaratory judgment that it is not obligated to indemnify Scrap for the underlying judgment. In the district court, both parties moved for summary judgment and the court granted QBE's motion. Scrap appealed.[1]

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). Summary judgment is appropriate

---

[1] After the appeal before us was filed, briefed, and argued, the federal district court entered an order on September 27, 2019, stating that "inadvertently, final judgment was not entered, and the file remains open," and directing the Clerk to "enter judgment and close the file." Thereafter, on the same date, the Clerk of the Court entered a "Final Declaratory Judgment" on both the declaratory judgment action and the counterclaim. As the district court itself notes, its order is to be performed "consistent with ECF No. 33," i.e. the order on appeal before us, which ends with a quite definite grant of summary judgment. It therefore seems to us the prior order was final and appealable. If not, the notice of appeal previously filed has become effective anyway pursuant to Fed. R. App. P. 4(a)(2). In an understandable abundance of caution, however, Scrap has also appealed the new order, which we consolidate with the existing appeal. This is purely procedural and alters our analysis in no way.

4

only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must draw all reasonable inferences in favor of the non-moving party. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1326 (11th Cir. 1998).

## III.  DISCUSSION

Under Florida law, the party claiming insurance coverage has the initial burden to show that a settlement or judgment represents damages that fall within the coverage provisions of the insurance policy. *U.S. Concrete Pipe Co. v. Bould*, 437 So. 2d 1061, 1065 (Fla. 1983); *Keller Indus., Inc. v. Employers Mut. Liab. Ins. Co. of Wis.*, 429 So. 2d 779, 780 (Fla. 3d DCA 1983). An insured's inability to allocate the amount of a judgment between covered and uncovered damages is therefore generally fatal to its indemnification claim. *Trovillion Constr. & Dev., Inc. v. Mid-Continent Cas. Co.*, 2014 WL 201678, at *8 (M.D. Fla. Jan. 17, 2014) (citing *Keller*, 429 So. 2d at 780). However, the burden of apportioning or allocating between covered and uncovered damages in a general jury verdict may be shifted to the insurer if the insurer did not adequately make known to the insured the availability and advisability of a special verdict. *See Duke v. Hoch*, 468 F.2d 973, 976-83 (5th Cir. 1972).[2]

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981.

Here, the district court correctly found that QBE had met its key responsibilities to Scrap, and thus the burden of proving allocation remained with Scrap. On December 2, 2014; April 21, 2015; May 13, 2015; February 22, 2016; and April 8, 2016, QBE wrote to Scrap's attorneys[3] advising Scrap of the need for allocation. In these letters, QBE told Scrap explicitly that Scrap would have to request a special verdict, differentiating covered damages from uncovered damages, and that if it did not, the failure to seek allocation could result in forfeiture of coverage for all damages.

QBE also twice attempted to intervene in the underlying suit for the purpose of assisting with the preparation of special-interrogatory verdict forms, on both January 30, 2015, and April 15, 2016. Though Scrap protests at length that QBE's attempted interventions were procedurally defective, the standard is notice, not successful intervention. *See Duke v. Hoch*, 468 F.2d at 979. That standard was certainly met here.

Furthermore, in the absence of an allocated verdict in the underlying trial, Scrap never provided the district court with a plausible method for separating those damages awarded by the jury that are covered by QBE's policies from those that

---

[3] As the district court notes, "Although Scrap argues that the various letters by QBE were not directly addressed to Scrap's trial counsel, but instead to Robert Beasley, the attorney for GSI, another defendant in the underlying suit, Scrap concedes, and the record shows, that Scrap's attorneys were all copied on these letters, 'and therefore, were aware of [the] contents.'" Perhaps it is for this reason that the district court and the briefs in this appeal refer to QBE writing "at least four times," rather than five, as one letter was addressed to a Mark Vanden Bergh and copied to Beasley, but not to Scrap's trial counsel. However, as the trial court ruled in refusing QBE's motion to intervene in the Scrap-Mullins dispute, Beasley was Scrap's "private counsel" throughout those proceedings.

6

are not. As the court in *Duke v. Hoch* recognized, this leaves Scrap with an "impossible" burden to overcome. *See* 468 F.2d at 977.

In order to get out from under the overwhelming evidence, catalogued above, that QBE fulfilled its duties under *Duke v. Hoch* and thus left the burden on Scrap, Scrap makes what amounts to a challenge to the whole legal framework. It posits a scenario, which it calls the "allocution trap," in which an insurer writes to the insured "suggesting an issue of coverage may exist and that a special verdict form should be used." At the same time, because the attorney for the insured is being paid by the insurer, he or she "refuse[s] to submit the interrogatories because they pertain to coverage issues, for which he claim[s] conflict." If this is done late enough in the day, the insured can be trapped:

> The coverage issues claimed by [the insurer] exist[] from the start of the case, yet [insurer-]appointed defense counsel conduct[s] no discovery which would . . . allow[] the special verdict form to be usable by the jury. . . . As the case progresse[s], [insurer-]appointed defense counsel, relying on the issue of conflict, ma[k]e[s] no effort to develop a case which would allow the special verdict forms to be used. As a result, the insured had lost the issue of coverage long before the trial court rejected the intervention or the use of the special verdict form. Conversely, [the insurer] prevail[s] on the issue of its alleged coverage exclusions without the risk of a separate declaratory action.

Therefore, the court (Scrap concludes) ought to adopt as a rule the suggestion contained in *Employers Insurance of Wasau v. Lavender*, 506 So. 2d 1166 (Fla. 3d DCA 1987). In that case, the court commended—and we presumably are being

7

asked to require—the insurer's intervening in the initial trial so as to request a second verdict from the same jury, allocating damages if there are any.

But while Scrap makes a cogent academic analysis of a potential gap in the *Duke v. Hoch* framework, this description does not match the case before us. Far from sitting back and letting Scrap develop its discovery plans in ignorance, QBE warned Scrap for the first time sixteen months before trial began, and reiterated this warning four more times before trial started. Thus, instead of being blindsided by late notice that it had to present a special-verdict form for which it had not prepared, Scrap was given ample time to prepare a strategy to accommodate this need.[4]  Also, unlike the hapless insured in the picture it paints, Scrap was not left without representation. Even though Scrap's trial counsel, Jester (who was paid by QBE), did indeed claim conflict and refuse to participate in discussions of QBE's intervention and the proposed special-verdict form, nevertheless Scrap's "private counsel,"[5] Beasley, was given repeated notice of the problem. (This was a point the district court explicitly noted and relied on in denying QBE's motion to intervene.) Scrap may gripe that this "negat[es] any benefit of procuring an insurance policy

---

[4] Scrap complains repeatedly that the proffered special-verdict form contained forty questions, that this would be confusing to the jury, and that many questions covered topics that were not otherwise going to be covered by the trial. But as Scrap conceded at oral argument, it was not forty-or-nothing. Indeed, QBE acknowledged when sending the questions, that it might not be necessary to ask many of them. The bottom line is, Scrap was made aware of the state of the law, and it fell to Scrap to formulate a strategy to meet the burden that it knew it would eventually have to bear. That Scrap, whether through inadvertence or a strategic choice, did not do so should not be laid at the feet of QBE, nor does it require a change in the law.

[5] Also referred to in the record as "personal counsel."

8

which provides for the cost of defense[,]" but that is a separate contract dispute. It does not relieve Scrap of its obligation—of which it was on notice—to have secured an allocated verdict, whether through Beasley or by hiring another attorney.[6]  Finally, to impose the suggestion in *Wasau* as a Florida rule would entail tricky decisions. Intervention currently lies in the discretion of the judge. Should we change that in this specific instance? If not, it would seem manifestly unjust to the insurer to have its liability depend on a decision over which it had no control. And there may be other reasons, not briefed before us, to decline to adopt this rule. The *Wasau* procedure, ultimately, may or may not be wise as an exception to *Duke* in some narrow circumstances—but those are not circumstances that apply here. Therefore, we need not rule on the adoption of the *Wasau* rule. Suffice it to say that the communications between QBE and Scrap fall squarely in the mine run of cases anticipated by *Duke*: QBE had a duty to inform Scrap of the availability and advisability of a special verdict, lest the burden shift; QBE did so; the burden thus did not shift, but remained on Scrap, which is unable to meet it.

---

[6] Indeed, Scrap also implies repeatedly that QBE *knew* Jester would refuse to submit special-verdict forms. Insofar as this goes beyond descriptive statement—QBE, like any other observer, could see that neither Jester nor the other members of Scrap's legal team were, in fact, submitting such forms—to alleging a kind of conspiracy, it is utterly unsupported by any evidence. In the summary judgment posture, the non-moving party cannot simply rely on speculation. *See Walker v. Darby*, 911 F.2d 1573 (11th Cir. 1990); *cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). More broadly, as the district court in this case correctly noted, the potential conflict of interest between the insurer and the insured, on issues of allocation, is precisely *why* the *Duke v. Hoch* standard exists—not a reason to disregard it.

Separately, we also reject Scrap's argument that "the district court erroneously applied the summary judgment standard by granting summary judgment to QBE despite expressly finding genuine issues of material fact exist." While the district court did find that "genuine issues of material fact" existed, it did so with respect to facts that prevented summary judgment in *Scrap's* favor, rather than QBE's. The court found, for example, that genuine issues of material fact existed as to whether the jury attributed the nuisance damages to "sickness" as opposed to "annoyance, discomfort, and/or inconvenience," whether the jury attributed any damages to property damages as defined in the written agreement, and whether any of the claims would be excluded under the pollution provision. All of these issues of fact support the district court's decision to deny Scrap's summary-judgment motion; none of them, however, would support denying QBE's similar motion.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to QBE.

**AFFIRMED.**